INTERNATIONAL UNION, United Mine Workers of America, Petitioner,

v.

MINE SAFETY AND HEALTH ADMINISTRATION, et al., Respondents,

Emerald Mine Corporation, Intervenor.

No. 85–1735.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 10, 1986.

Decided Oct. 2, 1987.

290

Earl R. Pfeffer, with whom Michael H. Holland and Mary Lu Jordan, Washington, D.C., were on the brief, for petitioner.

Linda L. Leasure, Dept. of Labor, with whom Cynthia Atwood, Associate Sol., Dept. of Labor, Ann Rosenthal, Counsel, Appellate Litigation and Mary Griffin, Dept. of Labor, Washington, D.C., were on the brief, for respondents.

R. Henry Moore, for intervenor.

Timothy M. Biddle, Washington, D.C., was on the brief, for amici curiae, Emery Mining Corp., et al., urging affirmance of the Secretary of Labor's decision.

Before EDWARDS and BORK, Circuit Judges, and SWYGERT, Senior

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

Circuit Judge, United States Court of Appeals for the Seventh Circuit.*

Opinion for the Court filed by Senior Circuit Judge SWYGERT.

SWYGERT, Senior Circuit Judge:

Petitioner United Mine Workers of America (UMWA) seeks review of a decision and order of the Assistant Secretary of Labor for Mine Safety and Health granting Emerald Mines Corporation's (Emerald) petition for modification of a mandatory safety standard at the Emerald No. 1 Mine. Because the Assistant Secretary failed to clearly articulate the test to be applied in evaluating a petition for modification, and because he did not identify the evidence he relied upon in granting Emerald's petition, we vacate the decision and remand.

I

With the passage of the Federal Mine Health and Safety Act of 1977 (the Act), 30 U.S.C. §§ 801 *et seq.*, Congress established a highly detailed set of mandatory health and safety standards applicable to underground coal mining. *See* 30 U.S.C. §§ 841–878. Congress placed enforcement of the Act with the Secretary of Labor, acting through the Mine Safety and Health Administration (MSHA). 29 U.S.C. § 557a. To provide for changes in technology and mining systems, section 101(a) of the Act allows the Secretary to promulgate improved industry-wide health and safety standards, provided that any such standards do not "reduce the protection" afforded miners by an existing standard. 30 U.S.C. § 811(a)(9). In contrast, section 101(c) permits the Secretary to modify the application of an existing safety standard to a particular mine "if the Secretary determines that an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard...." 30 U.S.C. § 811(c).[1] It is

[1]. Section 101(c) also allows such a modification if "the application of such standard to such mine will result in a diminution of safety to the

the Secretary's authority to grant a mine-specific modification under section 101(c) which is at issue in this case.

On July 29, 1982, Emerald filed a petition with the Secretary seeking modification of the safety standard set forth at 30 C.F.R. § 75.326 [2] at its No. 1 Mine.[3] The standard is one of several mandatory safety standards governing mine ventilation. Underground coal mines are ventilated by a set of tunnels or "entries" which continuously move air throughout the mine. At the Emerald No. 1 Mine, the "intake escapeway" is the entry through which fresh air is brought into the mine. It is also the miners' means of escape in the event of an emergency. Air already used to ventilate the mine is removed through the "return entry." The "track entry" is the entry through which miners and materials are hauled in and out of the mine. Finally, the "belt entry" is the tunnel containing the conveyor belts which transport coal from the active working sections of the mine to the surface.

The standard sought to be modified limits the velocity of air permitted in belt entries and prohibits the use of belt entry air to ventilate the underground working areas of the mine.[4] By limiting the air velocity in belt entries, the standard helps prevent the fanning of fires that may originate along belt haulageways. In addition, by prohibiting the use of air to ventilate working places, the standard keeps belt entry contaminants such as coal dust or fire by-products from reaching miners.

In its petition, Emerald proposed to use belt entry air to supplement the ventilation of the active working places of the mine.

As an alternative to the protection afforded by the standard, Emerald planned to install a low-level carbon monoxide (CO) detection system in the belt entries. According to Emerald, the CO detection system would provide miners with early warning of a fire in the belt entry before the fire reached a stage where the products of combustion would present a hazard to miners. Because the miners would be alerted in time for them to exit the mine safely, Emerald argued that the proposed modification would provide a measure of protection equal to that of 30 C.F.R. § 75.326.

Following the filing of the petition, MSHA conducted a field investigation pursuant to 30 C.F.R. § 44.13. On June 24, 1983, the Administrator for Coal Mine Safety and Health issued a proposed decision granting Emerald's petition subject to stated conditions. Thereafter, UMWA exercised its right under 30 C.F.R. § 44.14 to request a hearing before a Department of Labor Administrative Law Judge (ALJ) concerning the proposed decision. After the hearing, at which Emerald, MSHA and UMWA participated, the ALJ denied the petition on the ground that Emerald had failed to establish that the proposed alternative would meet the requirements of section 101(c).

Emerald and MSHA subsequently appealed the ALJ's decision to the Assistant Secretary of Labor, as is permitted under 30 C.F.R. § 44.33. On October 3, 1985, the Assistant Secretary reversed the ALJ's decision and granted the petition, subject to certain conditions.[5] In determining whether the modification should be granted under section 101(c), the Assistant Secretary

miners in such mine." This portion of section 101(c) did not serve as the basis for the Assistant Secretary's decision and is not at issue on appeal.

2. The standard is also set forth at 30 U.S.C. § 863(y)(1).

3. The Emerald No. 1 Mine is an underground bituminous coal mine that was opened in 1977 in Greene County, Pennsylvania.

4. The standard provides in relevant part:
    In any coal mine opened after March 30, 1970, the entries used as intake and return air courses shall be separated from belt haulage entries, and each operator of such mine shall limit the velocity of the air coursed through belt haulage entries to the amount necessary to provide an adequate supply of oxygen in such entries, and to insure that the air therein shall contain less than 1.0 volume per centum of methane, and such air shall not be used to ventilate active working places.
    30 C.F.R. § 75.326.

5. The Assistant Secretary's decision constitutes the final decision of the Department of Labor. 30 C.F.R. § 44.51.

compared the risks associated with the proposed modification with those resulting from the application of the standard at the mine. He concluded that implementing Emerald's proposal would improve the overall safety of the mine in several ways: it would improve ventilation in the belt entry itself by establishing a predictable direction of air flow; it would relieve pressure imbalances at the mine that Emerald argued resulted from compliance with the standard; and it would provide an additional intake airway and escape route to aid evacuation in the event of a fire in the existing intake escapeway. In addition, the Assistant Secretary determined that the proposed air velocity in the belt entry would not contribute to the rapid spread of fire by fanning, that the minimal increases in respirable dust levels would not result in increased health hazards, and that the CO detection system would be a reliable means of providing miners with an early warning of any fire in the belt entry. The Assistant Secretary therefore concluded that Emerald had satisfied the requirements of section 101(c). UMWA subsequently filed a petition for review of the Assistant Secretary's decision pursuant to section 101(d) of the Act, 30 U.S.C. § 811(d).

## II

■ In reviewing the Assistant Secretary's decision, this court must determine whether the granting of the petition for modification was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). UMWA argues that the Assistant Secretary applied the incorrect legal standard in granting Emerald's petition and that his decision therefore should be set aside. The portion of section 101(c) at issue provides that a petition for modification may be granted if "an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard." According to UMWA, the Assistant Secretary erred by failing to require that the proposed alternative both (1) achieve the result of the stan-

dard and (2) at all times provide the same measure of protection as the standard. UMWA argues that the "result" portion of the section 101(c) test requires that the alternative provide the same *kind* of protection as the standard, while the "at all times" language requires that the alternative provide the same *degree* of protection.

■ UMWA maintains that the "result" of the standard in question is the physical shielding of miners from belt air and any belt air contaminants, as well as the prevention of fires through reduction in air velocities. In contrast, the proposed alternative would simply alert the miners after-the-fact to the presence of a fire, without providing a barrier between miners and belt air contaminants. Because this is not the *kind* of protection offered by the standard, it fails to satisfy the "result" test under UMWA's interpretation of the statute. UMWA claims that if changes in technology produce an alternative which is superior to the standard but which does not achieve the precise "result" of the standard, the Assistant Secretary should resort to his power under section 101(a) to promulgate a new, industry-wide standard rather than dilute the section 101(c) test.

UMWA also contends that the proposed modification fails the "at all times" requirement. UMWA claims that CO monitors are not infallible and that even a fully operational unit might not detect smoking of the belt material itself, since such smoke would not necessarily contain carbon monoxide.

In addition, UMWA argues that the Assistant Secretary improperly considered safety benefits that allegedly would result from implementation of the proposed alternative, including an improvement in pressure imbalances and the addition of a second intake escapeway. The appropriate inquiry under section 101(c), according to UMWA, is whether the modification achieves the objectives of the standard, not whether it results in safety benefits unrelated to the standard. UMWA suggests that the proper way to remedy any pressure imbalances at the mine is for the Secretary to utilize other enforcement mea-

sures, rather than to sacrifice a mandatory safety standard.

MSHA and Emerald criticize UMWA's interpretation of section 101(c) as an overly restrictive one that would nearly always preclude a proposed modification from being approved. They maintain that a proposed modification "achieves the result of the standard" so long as it protects the miners from the hazards that the standard is designed to prevent—in this case, exposure to the by-products of combustion—regardless of the specific means of achieving that protection. Under this view, the "result" of the standard is synonymous with the "measure of protection" afforded by the standard. According to the respondents, the CO monitor will achieve the result of the standard because it will prevent miners from being exposed to harmful fire by-products. MSHA also maintains that the evidence in the record supports a finding that CO monitors are highly effective and reliable, so that the "at all times" requirement is fulfilled.

Respondents emphasize that modifications under section 101(c) are to be granted on a case-by-case basis, keeping in mind the unique conditions of the particular mine. They argue that the proper approach under section 101(c) is to compare the overall protection afforded miners by the application of the standard at the mine with the overall protection offered by the proposed modification. Since the modification allegedly will relieve ventilation problems related to the application of the standard at the mine, respondents maintain that the "measure of protection" afforded by the modification is at least as great as that afforded by the standard.

The Assistant Secretary did not specifically address these arguments concerning the interpretation of section 101(c), and it is unclear from his opinion how he construed the language in question. We therefore vacate the decision and remand so that the Assistant Secretary can more clearly artic-

ulate the test to be applied. On remand, the Assistant Secretary should determine the meaning of the phrase "achieving the result of such standard" and whether it is different from the phrase "no less than the same measure of protection." In addition, the Assistant Secretary should discuss how the test under section 101(c) differs from that under section 101(a), the standard for industry-wide rulemaking. Finally, he should analyze the extent to which the language of section 101(c) permits him to consider safety benefits derived from the proposed modification that are unrelated to the objectives of the standard.

Regardless of the test applied by the Assistant Secretary, we agree with UMWA that the Assistant Secretary failed to sufficiently discuss the evidence he considered in concluding that the test had been met. In an area as important as mine safety, the Assistant Secretary must show that he relied on substantial evidence in granting a petition for modification of a mandatory safety standard.[6] Yet the Assistant Secretary did not identify the evidence he relied upon in granting Emerald's petition, nor did he explain why he rejected other evidence, such as that presented by UMWA concerning the fallibility of CO detection systems. For the foregoing reasons, we vacate the decision and remand to the Assistant Secretary for further consideration in conformity with this opinion.

**6.** This court has recognized that "the distinction between the arbitrary and capricious standard and substantial evidence review is largely semantic." *Pacific Legal Foundation v. Dep't of* *Transportation,* 593 F.2d 1338, 1343 n. 35 (D.C. Cir.), *cert. denied,* 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979).