Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 11, 2005          Decided May 24, 2005

No. 04-1164

INTERNATIONAL UNION, UNITED MINE WORKERS OF
AMERICA,
PETITIONER

v.

MINE SAFETY AND HEALTH ADMINISTRATION AND
ELAINE CHAO, SECRETARY OF LABOR,
RESPONDENTS

———

Consolidated with
No. 04-1165

———

On Petitions for Review of an Order of the
Federal Mine Safety and Health Administration

———

*Judith E. Rivlin* argued the cause for petitioner International Union, United Mine Workers of America. With her on the briefs was *Grant F. Crandall*.

*Guy W. Hensley* argued the cause and filed the briefs for petitioner Jim Walter Resources, Inc.

*Harold P. Quinn, Jr.*, *Ralph H. Moore*, *Karen L. Johnston*, and *Trisha L. Culp* were on the brief for *amicus curiae* National Mining Association in support of petitioner.

*Jerald S. Feingold*, Attorney, Mine Safety & Health Administration, argued the cause for respondents. With him on the brief was *W. Christian Schumann*, Counsel.

Before: SENTELLE, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Two petitions for review challenge the Secretary of Labor's promulgation of the final rule entitled "Underground Coal Mine Ventilation Safety Standards for the Use of a Belt Entry as an Intake Air Course to Ventilate Working Sections and Areas Where Mechanized Mining Equipment is Being Installed or Removed," 69 Fed. Reg. 17,480-530 (Apr. 2, 2004) (codified at 30 C.F.R. pt. 75) ("Belt Air Rule"). In No. 04-1164, the International Union, United Mine Workers of America ("the Union") contends that the Secretary, by failing to grandfather existing mine-specific health and safety protections, has promulgated a belt air standard that is contrary to the "no-less protection" requirement of section 101(a)(9) of the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. §§ 801-962 (2000). It maintains this failure compromises the Secretary's "net effects" analysis, and because some miners will lose enhanced protections they previously enjoyed, the Secretary acted arbitrarily and capriciously. Although the Union's interpretation is compatible with the Mine Act's purpose to

protect the health and safety of miners, the Secretary's "net effects" analysis is consistent with the purpose, the statutory text, and the statutory scheme enacted by Congress. Accordingly, we deny the Union's petition for review.

In No. 04-1165, Jim Walter Resources, Inc. ("JWR"), a coal mining company, challenges the Secretary's promulgation of 30 C.F.R. § 75.350(a)(2), which sets a velocity cap of 500 feet per minute ("fpm"). It contends the cap is invalid because the Secretary failed to comply with the notice-and-comment requirements of the Mine Act, 30 U.S.C. § 811(a), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b) (2000). While the Secretary purports to rely on the "logical outgrowth" doctrine, that doctrine cannot be stretched as far as the Secretary suggests. In the notice of proposed rulemaking, the Secretary stated that she was not proposing a velocity cap because empirical research indicated a cap would increase safety problems, 68 Fed. Reg. 3,936, 3,950 (Jan. 27, 2003) ("NOPR"), and she failed to give notice, with an opportunity for comment, prior to promulgating the final rule, that she was considering imposing a cap, much less a cap of 500 fpm. Accordingly, we grant JWR's petition, vacate section 75.350(a)(2) of the Belt Air Rule, and remand the matter to the Secretary.

## I.

Subchapter I of the Mine Act sets forth the procedures for the Secretary to follow in developing a proposed rule for establishing a new mandatory national health and safety standard, and establishes various standards that are to be met based upon the consideration of certain factors. 30 U.S.C. § 811(a)(1)-(4). The term "mandatory health or safety standard" is defined in the Mine Act as the "interim mandatory health or safety standards established by subchapters II and III of this chapter, and the standards

promulgated pursuant to subchapter I of this chapter." *Id.* § 802(*l*). In enacting the Mine Act, Congress addressed certain mine safety concerns by establishing interim mandatory national health and safety standards, to remain in effect until replaced or superceded by the Secretary. *See id.* §§ 841, 862-78. Section 101(a) of the Mine Act directs the Secretary of Labor to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." *Id.* § 811(a). Section 101(a)(9), the "no-less protection" rule, provides that "[n]o mandatory health or safety standard promulgated under this subtitle shall reduce the protection afforded miners by an existing mandatory health or safety standard." *Id.* § 811(a)(9).

Under appropriate circumstances, the Secretary may exempt a mine from the mandatory national health and safety standards. Section 101(c) authorizes the Secretary to modify the application of any mandatory safety standard to a particular mine upon finding that:

> an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard, or that the application of such standard to such mine will result in a diminution of safety to the miners of such mine [and mine-specific conditions are required to ensure miner health and safety equivalent to the national standard].

*Id.* § 811(c).

The relevant interim belt air mandatory national standard enacted by Congress provides that:

> In any coal mine opened after the operative date of this subchapter, the entries used as intake and return aircourses shall be separated from belt haulage entries, and each operator of such mine shall limit the velocity of the air coursed through belt haulage entries to the amount necessary to provide an adequate supply of oxygen in such entries, and to insure that the air therein shall contain less than 1.0 volume per centum of methane, and such air shall not be used to ventilate active working places. . . .

*Id.* § 863(y)(1). While barring use of belt air ventilation of working areas, the interim standard permitted existing mines, opened on or before March 30, 1970, that were using belt air to continue doing so upon petition for modification of the interim standard. 30 C.F.R. § 75.326 (1991). During the fifteen-year period prior to 2003, the Secretary, acting through the Mine Safety and Health Administration ("MSHA"), 29 U.S.C. § 557a (2000), had granted approximately 90 such petitions, finding, after on site inspections, that the modifications provide "the same measure of safety protection as the existing standard," 68 Fed. Reg. at 3,937, by use of "the proper installation, operation, examination, and maintenance of [atmospheric monitoring systems ("AMS")] as part of a comprehensive safety program that contains other requirements," *id*. Generally, MSHA noted, mine operators have requested "the use of belt air to ventilate working places dependent upon the installation of an AMS with [carbon monoxide ("CO")] sensors for early-warning fire detection in the belt entry," *id*. at 3,938, to comply with MSHA's regulatory requirements on automatic fire warning devices, 30 C.F.R. § 75.1103, and as a regulatory option for monitoring methane, CO, and smoke, 68 Fed. Reg. at 3,938.

In January 1988, MSHA first proposed to revise the

interim air belt standard to allow air coursed through the belt entry to ventilate working places where mine operators had installed CO sensors in the belt entry. *Id.* at 3,937. After a series of public hearings, the Assistant Secretary for Mine Safety and Health called for a review of the safety factors associated with the use of such belt air. *Id.* The review culminated in the Belt Entry Ventilation Review ("BEVR") of August 1989, which concluded that ". . . directing belt entry air to the face can be at least as safe as other ventilation methods provided carbon monoxide monitors or smoke detectors are installed in the belt entry." *Id*. However, in light of the divergent views of industry and academia compared to those of labor representatives in response to publication of the report, 54 Fed. Reg. 35,356 (Aug. 25, 1989), no revisions were made to the interim standard. 68 Fed. Reg. at 3,937.

MSHA continued to be of the view that the interim belt air standard should be revised, and in January 1992, the Secretary appointed an Advisory Committee to make recommendations concerning the necessary conditions under which air in the belt entry could be safely used in the working areas of underground mines. *Id*. The Advisory Committee, following public meetings, issued a final report concluding that air in the belt entry could be safely used to ventilate working places in underground coal mines provided certain conditions are met. *Id.* MSHA also published this report. 57 Fed. Reg. 57,078 (Dec. 2, 1992).

Then, in January 2003, MSHA issued a NOPR, 68 Fed. Reg. at 3,936, to "allow the use of intake air passing through belt air coursers (belt air) to ventilate working sections and areas where mechanized mining equipment is being installed or removed in underground coal mines," *id*. According to MSHA, under the conditions set forth in the proposed rule,

use of belt air "would maintain the level of safety in underground mines while implementing advances in mining technology." *Id*. After public hearings and receipt of comments, MSHA promulgated the final rule, permitting mines using three or more entries to use air coursed through belt entries to ventilate working areas, when used with CO monitors and AMSs for fire detection, and conforming with new mandatory safety standards as well as existing standards regarding mine-specific ventilation plans in light of the actual safety needs created by the specific circumstances at individual mines. 69 Fed. Reg. at 17,482. The preamble stated:

> New technology has proven safe and effective in quickly and reliably detecting the products of combustion and providing early warning to miners. The use of belt air under this final rule will increase protection compared to mines that use only point-type heat sensors by quickly detecting products of combustion in the belt entry at an early stage of fire development and by rapidly providing warning . . . .
>
> . . . Advances in computer-operated atmospheric monitoring systems (AMS) have led to the acceptance of AMSs as an effective tool to monitor conditions in mine entries and detect the products of combustion at an early stage of fire development.

*Id*. at 17,481. The final rule, for example, prescribes specific requirements necessary for a mine operator to use the belt air course to ventilate working sections, including: (1) monitoring the air current passing through a point-feed regulator, *see* 68 Fed. Reg. at 17,526, for carbon monoxide or smoke; (2) monitoring the air with sensors in the belt air course for carbon monoxide or smoke; (3) installing a

mechanism by which the point-feed regulator may be closed from the intake air course without requiring a person to enter the crosscut where the point-feed regulator is located, and also with a means to close the regulator from a location in the belt air course immediately upwind of the crosscut containing the regulator; (4) maintaining a minimum air velocity of 300 fpm through the point-feed regulator; (5) obtaining approval of the locations of point-feed regulator(s), and; (6) installing an AMS as specified in section 75.351. 69 Fed. Reg. at 17,527. MSHA also addressed specific mine safety issues, such as separation of the primary escapeway from the belt entry, the average concentration of respirable dust in the intake airways, and stopping construction and maintenance, by noting the interrelationship between the various standards, and citing specific regulations addressing each of these concerns. *E.g.*, 69 Fed. Reg. at 17,494, 17,496-97 (citing 30 C.F.R. §§ 70.100(b), 75.380(g), 75.333, 75.383, 75.1502).

## II.

In No. 04-1164, the Union contends that the Secretary's revision of section § 75.350 in the Belt Air Rule violates the "no-less protection" provision of section 101(a)(9) of the Mine Act because it fails to grandfather each of the safety and health protections that had been included in mine-specific petitions approved under the interim standard. It cites several opinions of the court as suggesting that the Secretary's new regulation must achieve both the "general results" of the previously applicable standard and produce "a net gain" in the miners' overall safety and health. *See Int'l Union, United Mine Workers of Am. v. MSHA*, 920 F.2d 960, 964 (D.C. Cir. 1990) ("*Int'l Union*"). It then interprets the phrase "existing mandatory health or safety standard[s]" in section 101(a)(9) to require an analysis comparing the new rule against both Congress's interim standard barring the use of the belt air in working areas as well as the mine-specific conditions

previously in place affording miners "additional mine-specific protections." Br. of Pet'r at 8. Because the Secretary failed to consider mine specific modifications, the Union contends the Secretary was arbitrary and capricious, and abused her discretion in revising section 75.350 in the final rule.

In the final rule MSHA stated that:

> [S]ection 101(a)(9) requires that, in promulgating a new rule permitting the use of belt air, the Secretary weigh the net effect on safety under the new rule against the net effect on safety under the existing standard limiting the use of belt air. In promulgating this final rule, MSHA has done just that. MSHA has compared the protections provided by this final rule with the protections afforded by the existing standard and has concluded that . . . the final rule does not reduce the protection afforded by the existing standard.

69 Fed. Reg. at 17,485. Responding to objections that the "final rule did not address mine-specific concerns which were better addressed in petitions for modification," *id.*, MSHA noted that "petition language is proposed by mine operators . . . . [T]he 'alternative method' . . . need only . . . achieve[] the result of the [national] standard and guarantee[] a net 'equivalence' in mine safety, taking all effects on mine safety into account," *id.*, and further explained that mine-specific modifications "have never been held to constitute a mandatory safety standard of general application," *id.* MSHA also noted that it had determined that other safety and health provisions that may have been included in the petition as a result of negotiations between miner operators and miners' representatives "are not germane to the safe use of belt air," *id.,* and hence it is neither appropriate nor legally required to include them in the final rule, *id.*

On appeal, the Secretary maintains her interpretation of section 101(a)(9) as requiring a weighing of the net effect on safety under the new rule against the net effect on safety under the existing standard limiting use of belt air is consistent with its plain language and placement within section 101(a). She further maintains that, in any event, were she required to weigh previous modifications against the new rule, she adequately did so by comparing the differences between requirements under the final rule and requirements found in either granted petitions for modification of the interim standard or previously approved ventilation plans.

In addressing the Union's challenge to the Secretary's interpretation of section 101(a)(9), the court applies the familiar two-step analysis established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The court first must ask "whether Congress has directly spoken to the precise question at issue," and if it has, "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If Congress has not clearly spoken, the question for the court is whether the Secretary's interpretation is "a permissible construction of the statute." *Id.* at 843; *see Sec'y of Labor, MSHA v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003).

The plain language of the no-less protection provision requires only that "[n]o [new] mandatory health or safety standard . . . reduce the protection afforded miners by an existing mandatory health or safety standard." 30 U.S.C. § 811(a)(9). By its terms, section 101(a)(9) applies only to mandatory standards, not to mine-specific modifications. The structure of the Mine Act is consistent with this interpretation, for section 101(a) addresses the promulgation, enforcement and applicability of mandatory health and safety standards. The language of section 101(a)(9) is also consistent with

Congress's intent in the Mine Act to establish a regulatory program that would be uniform nationwide. S. Rᴇᴘ. Nᴏ. 95-181, at 13l (1977); *see United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 672 (D.C. Cir. 1989) (*"UMWA"*). Section 101(c), by contrast, provides the mechanism to enable the Secretary, consistent with the purpose of the Mine Act to protect the health and safety of miners, 30 U.S.C. § 801(a), to grant modifications from the national health and safety standard upon petition by a mine operator to implement an "alternative method," 30 U.S.C. § 811(c), that achieves "net [safety] 'equivalence,'" 69 Fed. Reg. at 17,485, with the existing national standard, or by petition of a miner or the miner's representative to prevent diminution of pre-existing levels of mine safety, 30 U.S.C. § 811(c).

Thus, a literal reading of the statute would appear to support the Secretary's view that section 101(c) modifications are not a mandatory safety standard and she therefore is not required under section 101(a)(9) to compare new mandatory standards against mine-specific modifications. Accordingly, the Secretary compared the safety of the work environment created by compliance with the new Belt Air Rule with the previous interim standard. Calling attention to the advances in mining technology, allowing reliable and quick detection of products of combustion, MSHA followed with a section-by-section analysis to demonstrate that through new technological advances and the interrelationship between the various existing and new standards under the new Belt Air Rule, the new rule maintained or improved miner safety.

However, the court need not rely on "a strict literal reading" of the Mine Act, *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 405 (D.C. Cir. 1976), to conclude that the Secretary's interpretation does not impair "the statute's

effectiveness as a tool for bringing about improvements in mine health and safety conditions," *id.* The court has previously deferred to the Secretary's "net effects" approach in the context of section 101(c), *see Int'l Union*, 920 F.2d at 963-64, and we conclude that approach is reasonable in this context as well. Under the "net effects" approach, the Secretary compares, for purposes of evaluating a petition under section 101(c), "all safety benefits resulting from the standard and all the safety benefits resulting from the alternative method," based, in part, on the "interrelationship of the various standards with one another." *Id.* at 963. The Secretary invoked the "net effects" analysis here, evaluating whether the net safety and health effects of the new Belt Air Rule are equivalent or better than the protection afforded under the interim belt air standard and the mine-specific modifications. In the preamble to the proposed rule, which included a table comparing the proposed rule to the conditions contained in the twenty most recently granted petitions for modifications, 68 Fed. Reg. at 3,937, 3,945-48, 3,962, and in the preamble to the final rule, which explained that MSHA "reviewed nearly all of the petitions granted since 1978," MSHA compared the "net effects" of the new belt air standard relative to the interim standard and the mine-specific conditions set forth in previously granted petitions for modification of the application of the interim standard, 69 Fed. Reg. at 17,485, 17,486-95, 17,498, 17,508. For example, in addition to a condition-by-condition "net effects analysis" of twenty previously granted mine-specific conditions, *id.* at 17,486-92, MSHA also addressed mine-specific conditions raised by commentators throughout the preamble to the final rule, such as the mine-specific requirement for an intake travelway on a longwall tailgate, by noting that existing standard 30 C.F.R. § 75.384 already required travelways, *id.* at 17,485.

The Union challenges the Secretary's "net effects" analysis on the ground that "[w]ithout considering each and every one of those pre-existing mine-specific modifications, [the Secretary] cannot resolve if any miner suffered a diminution when the new rule eliminated the mine-specific modifications." Reply Br. of Pet'r UMWA at 5. For example, the Union maintains that miners at the Cumberland Mine in Pennsylvania now enjoy less protection than before the Belt Air Rule took effect, pointing to a 1999 modification to the interim standard that allowed Cumberland to use belt air to ventilate the working places subject to, inter alia, a velocity cap, audible and visual alarms, a maximum concentration of respirable dust at or below 1.0 milligrams per cubic meter of air within 15 feet of the working section belt tailpiece, and maintenance of the belt entry, to the extent practical, at the lowest pressure of all intake air courses.

However, the Union's challenge to the "net effects" approach is based on a flawed interpretation of mine-specific modifications under section 101(c) as involving health and safety protections that exceed the mandatory national standard, something the plain language of section 101(c) does not require and thus does not underlie our deference to the "net effects" approach. The "net effects" analysis is a means to assess "whether the modification achieves a net gain in mine safety (or at least equivalence), taking all effects into account." *Int'l Union*, 920 F.2d at 963. As a matter of "a strict literal reading" of the language of the Mine Act, *Zeigler Coal Co.*, 536 F.2d at 405, then, because modifications under section 101(c) need only be equivalent to the existing mandatory standard in terms of net health and safety, it could be said that it was permissible for the Secretary to invoke her "net effects" analysis simply to compare the new mandatory standard against the protection afforded by the interim standard. However, the Secretary in fact addressed mine-

specific conditions, as, for example, each of the conditions in the modification allowing the Cumberland Mine to use belt air to ventilate working areas to ensure there was no diminution in health or safety for the miners provided under the existing national standard. *E.g.*, 69 Fed. Reg. at 17,494-97. MSHA thus pointed to modern technology, including advances in computer-operated AMSs that enable early warning of fires and combustion levels as achieving net equivalence in health and safety through the reduction of false alarms and whistles and detection failures. 69 Fed. Reg. at 17,481, 17,483. While acknowledging that some mine-specific modifications contained conditions that exceeded what was required to achieve net health and safety equivalence with the previously existing interim standard, the Secretary determined that such measures are not required to achieve health and safety levels deemed adequate under the existing standard and the new rule. 60 Fed. Reg. at 17,485.

Under the circumstances, the Union fails to explain how, under a "net effects" approach, allowing belt air ventilation of working areas under certain conditions diminishes the safety and health conditions of the miners at the Cumberland mine. To the extent the Union takes issue with the ultimate conclusion of what is necessary to ensure equivalent safety, the Union invades an area within the Secretary's expertise. *Nat'l Mining Ass'n v. MSHA*, 116 F.3d 520, 543 (D.C. Cir. 1997) (citing *Int'l Union*, 920 F.2d at 963-64). To the extent the Union relies on statements in the court's opinions that the mine-specific conditions established by a petition have the same effect as a mandatory standard, it fails to acknowledge the enforcement context. MSHA regulations provide that "[a] modification, together with any conditions, [has] the same effect as a mandatory safety standard." 30 C.F.R. § 44.4(c). For example, in *Energy West Mining Co. v. MSHA*, 16 F.M.S.H.R.C. 1414, 1994 WL 380387, *2 (1994), a mine

operator was cited by MSHA for failing to abide by the mine's approved petition for an "alternative method" to satisfy the requirements of 30 C.F.R. § 75.326, by using unapproved diesel-powered trucks in the mine, contravening the condition requiring that MSHA approve all diesel-powered equipment operated at particular sites within that mine. *Id.* at *2. In other words, a modification is mine-specific, and with respect to that mine it has the same effect on a mine operator as a mandatory standard for purposes of required compliance with safety standards. *Int'l Union, United Mine Workers of Am. v. MSHA* (*Jim Walter Res., Inc*), 931 F.2d 908, 909 (D.C. Cir. 1991); *Int'l Union, United Mine Workers of Am. v. MSHA* (*Emerald Mine Corp.*), 830 F.2d 289, 290-91 (D.C. Cir. 1987); *Int'l Union, United Mine Workers of Am. v. MSHA* (*Kaiser Coal Corp.*), 823 F.2d 608, 610 (D.C. Cir. 1987); *MSHA v. Peabody Coal Co.*, 1994 WL 395108 (F.M.S.H.R.C.), *5 (1993).

For these reasons, the Secretary could reasonably conclude under a "net effects" approach that previous mine-specific modifications were adequately addressed by the final rule or existing standards under which appropriate mine-specific requirements are adopted through the ventilation plan process, or were the result of negotiations between the union and mine operator, and extended beyond what was required to provide the same degree of safety as the previous standard. *See* 69 Fed. Reg. at 17,494, 17,496-97; *see also UMWA*, 870 F.2d at 672. Although the Union's interpretation of section 101(a)(9) requiring enhanced mine specific modifications to be grandfathered in any new mandatory national standard is consistent with the purpose of the Mine Act to protect the safety and health of miners, 30 U.S.C. § 801(a), the Secretary's "net effects" interpretation also is consistent with the statutory scheme. Instead of requiring the grandfathering of enhanced mine-specific protections, the statutory scheme

enacted by Congress contemplates that the Secretary will promulgate mandatory national health and safety standards while mine-specific protections will be established through a petitioning process. Under section 101(c), Congress placed the burden on the mine operator to comply with the Secretary's mandatory national standards or seek a net equivalent modification, and on the miner or the miner's representative to petition for the imposition of mine-specific conditions to ensure those miners are not subject to diminution of their safety and health by a new national standard. While some miners also may enjoy enhanced safety conditions, either as a result of a modification or a collective bargaining agreement or otherwise, Congress did not require that they receive protections above and beyond those set by the national standards and left to the Secretary to determine the appropriate adjustments to the interim standards. *See* 30 U.S.C. § 811(c). Even if, as the Union implies, Congress might have better achieved its purpose to protect the safety and health of miners by adopting the Union's interpretation of section 101(a)(9), the statutory language indicates that Congress has chosen a different path that does not leave miners who enjoyed enhanced protections without recourse.

Accordingly, we deny the petition for review in No. 04-1164.

### III.

Jim Walter Resources, Inc., ("JWR"), challenges the Secretary's decision to include a maximum air velocity cap in its Final Rule, 30 C.F.R. § 75.350(a)(2), contending that the Secretary failed to provide notice and the opportunity to be heard before including the cap in its final rule. The proposed rule provided that "[a] *minimum* air velocity of 300 feet per minute must be maintained through the point-feed regulator." 68 Fed. Reg. at 3,965 (emphasis added). The final rule

provides that "[t]he *maximum* air velocity in the belt entry must be no greater than 500 feet per minute, unless otherwise approved in the mine ventilation plan." 69 Fed. Reg. at 17,526 (emphasis added). On appeal, the Secretary recognizes the differences but maintains the notice requirements were nonetheless satisfied because the final rule is a "logical outgrowth" of the proposed rule. Whether governed by the more stringent requirement under section 101(a)(2) of the Mine Act, 30 U.S.C. § 811(a)(2), or section 4 of the APA, 5 U.S.C. § 553(b), *see Zeigler Coal Co.*, 536 F.2d at 404, we hold that the maximum cap provision of the final rule was not a "logical outgrowth" of the proposed rule.

Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). While an agency may promulgate final rules that differ from the proposed rule, *Shell Oil Co. v. EPA*, 950 F.2d 741, 750 (D.C. Cir. 1991), a final rule is a "logical outgrowth" of a proposed rule only if interested parties "'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period," *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (citing *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003)). The "logical outgrowth" doctrine does not extend to a final rule that is a brand new rule, since "[s]omething is not a logical outgrowth of nothing," *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994), nor does it apply where interested parties would have had to "divine [the Agency's] unspoken thoughts," *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d

1280, 1299 (D.C. Cir. 2000) (quoting *Shell Oil Co.*, 950 F.2d at 751) because the final rule was "surprisingly distant" from the proposed rule, *cf. id.*

The Secretary acknowledges that the premise of the "logical outgrowth" doctrine is that "the agency has alerted interested parties to the possibility of the agency's adopting a rule different than the one proposed."  Br. of Resp't at 29-30 (quoting *Kooritzky v. Reich*, 17 F.3d at 1513).   Yet the preamble to the proposed rule stated that it did not include a maximum velocity air cap.   MSHA referred to the Advisory Committee's Recommendation that "Velocities, both minimum and maximum, should provide air that is capable of containing methane and dust levels at or below the levels specified in the standards," 68 Fed. Reg. at 3,944, but determined it would "not include language to require limits on the air quantity carried in the belt entry or air course," *id.* at 3,946.   MSHA proposed to eliminate, rather than include a maximum velocity air cap, explaining that:

> Existing § 75.350 requires that the air velocity in the belt entries be limited to the amount necessary to provide an adequate supply of oxygen in these entries and to assure that the air contains less than 1.0 percent methane.  We have not included in the proposed rule the provision in existing § 75.350 that limits the air velocity in the belt entry. . . . Research has shown that higher velocities have a cooling effect on developing fires, and higher quantities reduce concentrations of volatile gases.   In effect, the restriction of velocity creates additional potential hazards of smoke rollback, methane and hydrogen layering, and development of fuel-rich fires.

*Id.* at 3,950.   Other references in the preamble to a velocity cap did not indicate the possibility of a maximum cap much

less one set at 500 fpm. *See, e.g., id.* at 3,946. Neither of the two reports on belt air previously published by MSHA indicated the possibility of a maximum velocity cap of 500 fpm: The BEVR stated that "[t]est data do not support limiting belt entry air velocity" and concluded that "there is no reason to limit the velocity of air in the belt entry provided that the belt entry does not become the primary intake aircourse," Joint Appendix at 70, while the Advisory Committee Report addressed only maximum air velocities of 1200, 1500, and 2000 fpm, *id.* at 66, velocities more than twice the cap in the final rule.

In *Shell Oil Co.*, 950 F.2d at 751, the proposed rule included a provision for listing hazardous waste where the agency had data indicating the waste met identified characteristics, with listing to play a supplementary function to increase certainty of the process. *Id.* at 751-52. The final rule, by contrast, placed a heavy emphasis on listing, rendering the final rule more expansive, more specific, and having a different emphasis in the regulatory structure. *Id.* at 752. The court invalidated the rule for lack of actual notice or satisfaction of the "logical outgrowth" test, observing that "an unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public should have anticipated." *Id.* at 751. The inclusion of a maximum velocity cap here represents a similar "unexpressed intention," *id.*, and the Secretary could not have expected interested parties to realize that she would consider abandoning her proposed regulatory approach based on empirical research indicating such a cap was potentially dangerous to miners, simply because she invited commentary on a proposed rule that included a *minimum* air velocity, *see Nat'l Mining Ass'n*, 116 F.3d at 531.

In terms presaging the Secretary's argument that JWR

received notice through its participation in the rulemaking, the court in *Shell Oil* explained that while parties involved in public hearings might have anticipated the potential for avoiding regulation, "it was the business of the [Agency], and not the public, to foresee that possibility and to address it in its proposed regulations." *Shell Oil*, 950 F.2d at 751. The court also rejected the notion, suggested by the Secretary here, that comment evidencing recognition of a problem can inform the public "of how, or even whether, the agency will choose to address it." *Id.* There were some comments during the hearings urging the Secretary to set a maximum velocity cap, but no indication by the Secretary that she was intending to do so. As the court observed in *Shell Oil*, "ambiguous comments and weak signals from the agency gave petitioners no such opportunity to anticipate and criticize the rules or to offer alternatives. Under these circumstances, the . . . rules exceed the limits of a 'logical outgrowth.'" *Id.* While there are circumstances when public comments may raise a foreseeable possibility of agency action, *NRDC v. Thomas*, 838 F.2d 1224, 1243 (D.C. Cir. 1988), *cert. denied sub nom, Ala. Power Co. v. Thomas*, 488 U.S. 888 (1988), illustrates the outer limits of the "logical outgrowth" doctrine. In that case, which the court acknowledged "stretche[d] the concept of 'logical outgrowth' to its limits," a comment on a proposed rule suggested a regulatory approach similar to the approach ultimately adopted by the agency. The agency issued a public notice advising of the new approach two weeks prior to final promulgation of the rule, and the interested parties were afforded the opportunity to file objections prior to final promulgation of the rule. By contrast, here no comments suggested a maximum velocity cap of 500 fpm, and more importantly, MSHA did not afford a comparable public notice of its intent to adopt, much less an opportunity to comment on, such a cap. *See also Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Donovan*, 757 F.2d 330, 340 (D.C. Cir. 1985).

The Secretary suggests that any error is harmless, *see* 5 U.S.C. § 706, because JWR has obtained a modification to the final rule, allowing it to operate with a ventilation plan that exceeds the maximum air velocity cap. However, according to the Secretary's brief, MSHA cited JWR for exceeding the 500 fpm velocity cap at its belt entries without an approved plan, and required JWR to submit a ventilation plan if it wanted to continue mining in excess of 500 fpm. JWR, in turn, states in its brief that the plan is subject to six month review, and approval could be revoked upon subsequent review, and points to other evidence of prejudice, including the loss of an opportunity to offer comments, in light of its experience, on the cap set at 500 fpm.

Because the maximum velocity cap of 500 fpm was not a "logical outgrowth" of the proposed rule, we grant the petition in No. 04-1165, vacate section 75.350(a)(2) of the Belt Air Rule, and remand the matter to the Secretary. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993).