# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2005         Decided October 7, 2005

No. 04-1083

ENVIRONMENTAL INTEGRITY PROJECT, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

UTILITY AIR REGULATORY GROUP, ET AL.,
INTERVENORS

———

Consolidated with
04-1243

———

On Petitions for Review of an Order of the
Environmental Protection Agency

———

*Keri N. Powell* argued the cause for petitioners. With her on the briefs were *Howard I. Fox, David G. McIntosh, Michael C. Davis, Jennifer M. Wagman, Bradley A. Farrell*, and *Christine A. Fazio. John D. Walke* and *Kelly Haragan* entered appearances.

*David J. Kaplan*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were

*John C. Cruden*, Assistant Attorney General, and *Kerry E. Rodgers*, Counsel, U.S. Environmental Protection Agency. *Christopher S. Vaden* and *Jon M. Lipshultz*, Attorneys, U.S. Department of Justice, and *Nancy A. Ketcham-Colwill*, Counsel, U.S. Environmental Protection Agency, entered appearances.

*William H. Lewis, Jr.*, *Lauren E. Freeman*, *Leslie Sue Ritts*, *Julie C. Becker*, *Charles H. Knauss*, and *M. Elizabeth Cox* were on the brief of intervenors Clean Air Implementation Project, et al. in support of respondent.

Before: GINSBURG, *Chief Judge*, and SENTELLE and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: In these consolidated cases, the Environmental Integrity Project and other petitioners petition for review of the Environmental Protection Agency's Part 70 regulations, as well as the Agency's revised interpretation of its "periodic" and "umbrella" monitoring rules. Petitioners contend EPA's Part 70 regulations are arbitrary, capricious, and otherwise unlawful. In addition, petitioners claim EPA's actions in this case violate the notice-and-comment requirements of the Administrative Procedure Act (APA). Because we agree EPA's final rule was not a "logical outgrowth" of the Agency's proposed interim rule, we grant the petition for review in No. 04-1083, vacate the final rule, and remand the matter to the Secretary. We do not reach the issues presented in No. 04-1243.

## I. Background

Title V of the 1990 Amendments to the Clean Air Act (CAA) requires that certain air pollution sources, including every major stationary source of air pollution, each obtain a

single, comprehensive operating permit to assure compliance with all emission limitations and other substantive CAA requirements that apply to the source. *See* 42 U.S.C. §§ 7661a(a), 7661c(a) (2000); *Virginia v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996) (describing the Title V permit as "a source-specific bible for Clean Air Act compliance"). In addition, all sources with Title V permits must conduct monitoring of their emissions that is sufficient to assure compliance with applicable requirements under the CAA. *See* 42 U.S.C. § 7661c(a), (c) (2000).

To implement these statutory mandates, EPA has promulgated numerous monitoring regulations, which are codified at 40 C.F.R. Parts 70 and 71.[1] Two of Part 70's rules are relevant here. The "periodic monitoring" rule, 40 C.F.R. § 70.6(a)(3)(i)(B), requires that

> [w]here the applicable requirement does not require periodic testing or instrumental or noninstrumental monitoring (which may consist of recordkeeping designed to serve as monitoring), [each Title V permit must contain] periodic monitoring sufficient to yield reliable data from the relevant time period that are representative of the source's compliance with the permit, as reported pursuant to [§ 70.6(a)(3)(iii)]. Such monitoring requirements shall assure use of terms, test methods, units, averaging periods, and other statistical conventions consistent with the applicable requirement. Recordkeeping provisions may be sufficient to meet the requirements of [§ 70.6(a)(3)(i)(B)].

---

[1]The final rule challenged in this case applies to monitoring regulations that appear in identical form in both Part 70 and Part 71. For ease of reference, we—like the parties—refer to EPA's Title V monitoring requirements as the "Part 70" rules, but all such references apply equally to Part 71's parallel monitoring provisions.

The "umbrella" rule, 40 C.F.R. § 70.6(c)(1), requires that each Title V permit contain, "[c]onsistent with paragraph (a)(3) of this section [*i.e.*, the "periodic monitoring" rule], compliance certification, testing, monitoring, reporting, and recordkeeping requirements sufficient to assure compliance with the terms and conditions of the permit." EPA must review and approve all Title V permits, and if a specific permit requires insufficient monitoring, EPA must reject it. *See* CAA § 505, 42 U.S.C. § 7661d (2000).

In November and December 2000, EPA rejected two Title V permits. *See In the Matter of Pacificorp*, Petition No. VIII-00-1 (Nov. 16, 2000), JA 410-34 ("*Pacificorp*"); *In the Matter of Fort James Camas Mill*, Petition No. X-1999-1 (Dec. 22, 2000), JA 435-69 ("*Fort James*"). In both decisions, EPA held the "umbrella" rule empowers state permitting authorities to review, on a case-by-case basis, the sufficiency of each permittee's monitoring requirements, *independent* of any other monitoring that might be imposed under the "periodic monitoring" rule. Thus, EPA concluded that where a permit requires no "periodic" monitoring at all, the "umbrella" rule is satisfied by meeting the more substantive requirements of the "periodic monitoring" rule. On the other hand, where there is some periodic monitoring but it is not sufficient to assure compliance, the umbrella rule's "*separate regulatory standard*" governs instead and requires case-by-case enhancement of existing monitoring "as necessary to be sufficient to assure compliance." *Pacificorp* at 18-19, JA 427-28 (emphasis added); *see also Fort James* at 7, JA 441.

On September 17, 2002, EPA published a proposed rule to clarify the monitoring required in Title V permits by "codifying" the interpretation of Part 70 that the Agency embraced in *Pacificorp* and *Fort James*. *See* 67 Fed. Reg. 58,561 (Sept. 17, 2002). Specifically, EPA proposed to remove the italicized prefatory language to § 70.6(c)(1) providing that all Title V permits contain, "*[c]onsistent with paragraph (a)(3) of this section*," monitoring "sufficient to assure compliance with the

terms and conditions of the permit." EPA proposed that the deletion of the italicized language from its umbrella rule would clarify the fact that its Part 70 regulations operate independently of one another, and the "separate regulatory standard" of § 70.6(c)(1) *requires* case-by-case supplementation of permits with insufficient monitoring, regardless of whether the permit also requires periodic monitoring under § 70.6(a)(3). *See* 67 Fed. Reg. at 58,561. A contrary interpretation would render "superfluous" § 70.6(c)(1)'s sufficiency requirement. *Id.* at 58,564.

In its final rule, however, EPA decided not to amend Part 70, based on EPA's "interpretation of the [CAA], the plain language and structure of [the umbrella rule] and the policy considerations discussed in this preamble." 69 Fed. Reg. 3202, 3204 (Jan. 22, 2004). Instead of codifying *Pacificorp* and *Fort James*, EPA's final rule switched course and adopted the opposite position, holding §§ 70.6(a)(3) and 70.6(c)(1) are not "separate regulatory standard[s]," and permits that satisfy the former subsection cannot be supplemented with additional monitoring requirements under the latter. The upshot of EPA's final interpretation of its Part 70 rules is that state permitting authorities are now *prohibited* from adding new monitoring requirements under the "umbrella" rule if the Title V permit already contains some (albeit insufficient) monitoring under the "periodic monitoring" rule.

EPA explains its abandonment of the proposed rule (and its adoption of the inverse interpretation of its Part 70 regulations) on the basis of public comments, which insisted that source-specific, case-by-case reviews by permitting authorities would have been unduly time-consuming and wasteful of valuable regulatory resources. A better approach, EPA claims, is to bar all supplemental monitoring and case-by-case sufficiency reviews for permits that already require some periodic monitoring and to address any inadequacies in the current monitoring regime through a four-part nationwide rulemaking

process. Petitioners argue that regardless of the corrective actions EPA has planned for the future, its Part 70 rules are presently unlawful and must be set aside.

## II. Analysis

### A.

This Court will uphold EPA's final agency action unless it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A) (2000); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 53 (D.C. Cir. 2002). However, an interpretation of a legislative rule "cannot be modified without the notice and comment procedure that would be required to change the underlying regulation—otherwise, an agency could easily evade notice and comment requirements by amending a rule under the guise of reinterpreting it." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 546 (D.C. Cir. 1999); *see also Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997).

### B.

The Environmental Integrity Project and other petitioners raise four principal arguments in their petition for review. First, petitioners argue EPA's Part 70 regulations unlawfully, arbitrarily, and capriciously compel state permitting authorities to accept "inadequate but 'periodic' monitoring . . . without enhancement." 67 Fed. Reg. 58,529, 58,532 (Sept. 17, 2002). Second, petitioners argue the interpretation of Part 70 in EPA's final rule undermines the 1990 Amendments to the CAA by reinstating state-by-state variations in monitoring requirements and arbitrarily treating similarly situated sources differently. Third, petitioners argue the final rule violates CAA § 114(a)(3)'s "enhanced monitoring" requirements. *See* 42 U.S.C. § 7414(a)(3) (2000); *Natural Res. Def. Council v. EPA*, 194 F.3d 130, 135-36 (D.C. Cir. 1999) (thrice suggesting the independent

operation of Part 70's umbrella and periodic monitoring rules, combined with EPA's Compliance Assurance Monitoring Rule, constitute "enhanced monitoring"). Fourth and finally, petitioners argue that EPA's final rule violates APA §§ 551(5), 553(c), because it was not a "logical outgrowth" of the Agency's proposed interim rule and therefore did not comport with the requirements of notice-and-comment rulemaking. *See Sprint Corp. v. FCC*, 315 F.3d 369, 375-76 (D.C. Cir. 2003); *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994).

Because we conclude the fourth and final argument is dispositive in this case, we need not and do not reach petitioners' other claims. *See Ne. Maryland Waste Disposal Auth. v. EPA*, 358 F.3d 936, 947 (D.C. Cir. 2004); *Harbor Gateway Commercial Prop. Owners' Ass'n v. EPA*, 167 F.3d 602, 604 (D.C. Cir. 1999).

## C.

Last term, in *International Union, United Mine Workers of America v. Mine Safety & Health Administration*, 407 F.3d 1250 (D.C. Cir. 2005) ("*International Union*"), we noted:

> [The APA's n]otice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.

*Id.* at 1259 (citing *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983)). Given the strictures of notice-and-comment rulemaking, an agency's proposed rule and its final rule may differ only insofar as the latter is a "logical outgrowth" of the former. *See Shell Oil Co. v. EPA*, 950 F.2d 741, 750-51 (D.C. Cir. 1991); *Ne. Maryland Waste Disposal Auth.*, 358 F.3d at 952 (stating a final rule is a "logical outgrowth" of a proposed rule only if interested parties

"'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period") (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003)). The "logical outgrowth" doctrine does not extend to a final rule that finds no roots in the agency's proposal because "[s]omething is not a logical outgrowth of nothing," *Kooritzky*, 17 F.3d at 1513, nor does it apply where interested parties would have had to "divine [the agency's] unspoken thoughts," *Arizona Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000) (quoting *Shell Oil*, 950 F.2d at 751), because the final rule was "surprisingly distant" from the Agency's proposal. *International Union*, 407 F.3d at 1260.

Thus, we have refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities. In *International Union*, for example, the Agency's proposed rule provided that "[a] *minimum* air velocity of 300 feet per minute must be maintained" to ventilate underground coal mines. 68 Fed. Reg. 3936, 3965 (Jan. 27, 2003) (emphasis added). The final rule, however, provided that "[t]he *maximum* air velocity in the belt entry must be no greater than 500 feet per minute, unless otherwise approved in the mine ventilation plan." 69 Fed. Reg. 17,480, 17,526 (Apr. 2, 2004) (emphasis added). Although "[t]here were some comments during the hearings urging the Secretary to set a maximum velocity cap," we vacated the final rule because the Agency "did not afford a . . . public notice of its intent to adopt, much less an opportunity to comment on, such a cap." *International Union*, 407 F.3d at 1261; *see also Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (stating EPA "cannot bootstrap notice from a comment").

The final rule in this case—unlike those at issue in cases like *International Union*, *Northeast Maryland Waste*, and *Shell Oil*—does not purport to be a "rule" at all; it purports to be a mere "interpretation." In EPA's interim rule, the Agency

proposed to delete the prefatory language of 40 C.F.R. § 70.6(c)(1) to "codify the understanding set forth in the *Pacificorp* and *Fort James* orders, where [EPA] characterized § 70.6(c)(1) [*i.e.*, the 'umbrella' rule] as a 'separate regulatory standard' from § 70.6(a)(3)(i)(B) [*i.e.*, the 'periodic monitoring' rule]." 67 Fed. Reg. 58,561, 58,564 (Sept. 17, 2002). In its final rule, however, EPA "decided not to adopt the changes to the regulatory text of the umbrella monitoring rules that were proposed in September 2002." 69 Fed. Reg. 3202, 3202 (Jan. 22, 2004). Instead, EPA "ratifie[d] the regulatory text as it is currently worded," and the Agency "determined that the correct interpretation of [the 'umbrella' rule] *do[es] not establish a separate regulatory standard* or basis for requiring or authorizing review and enhancement of existing monitoring independent of any review and enhancement as may be required under [the 'periodic monitoring' rule]." *Id.* at 3204 (emphasis added). Thus, the final rule not only did not adopt the proposed interim rule but also adopted a "reinterpretation" of the unamended text.

Of course, there is nothing objectionable in the Agency's refusal to adopt its proposed amendments to Part 70's text. *See Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989) ("One logical outgrowth of a proposal is surely, as EPA says, to refrain from taking the proposed step."); *see also Ne. Maryland Waste Disposal Auth.*, 358 F.3d at 951-52. However, EPA's final rule in this case did more—after taking its first bite at the interpretive apple in its *Pacificorp* and *Fort James* orders, EPA adopted a "reinterpretation" of Part 70's unrevised text. This flip-flop complies with the APA only if preceded by adequate notice and opportunity for public comment. *Compare Alaska Prof'l Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999) ("When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and

comment."), *and Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997) ("Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."), *with Hudson v. FAA*, 192 F.3d 1031, 1036 (D.C. Cir. 1999) (stating agency may change its longstanding policies without notice and comment, so long as "there is no dispute as to the regulation's meaning"), *and Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("[I]nterpretative rules and policy statements are quite different agency instruments. An agency policy statement does not seek to impose or elaborate or interpret a legal norm. It merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm.").

Both of EPA's conflicting constructions are the very essence of "definitive interpretation[s]" of the Part 70 regulations. In late 2000, when EPA issued its orders in *Pacificorp* and *Fort James*, it relied solely upon the umbrella rule's "*separate regulatory standard*" to require case-by-case enhancement of existing monitoring "as necessary to be sufficient to assure compliance." *Pacificorp* at 18-19, JA 427-28 (emphasis added); *see also Fort James* at 7-9, JA 441-43; *id.* at 24 n.10, JA 458 n.10. In 2004, EPA's final rule carried similarly forceful effect (albeit in the diametrically opposite direction):

> EPA has determined that the correct interpretation of [the 'umbrella' rules] is that these provisions *do not establish a separate regulatory standard . . . .* EPA has determined that where the periodic monitoring rules do not apply, [the 'umbrella' rules] *do not require or authorize* a new and independent type of monitoring in permits in order for the permits to contain monitoring to assure compliance as required by the Act.

69 Fed. Reg. at 3204 (emphases added). Given the mandatory language in both of EPA's interpretations, there can be little doubt that both purported to "bind[] private parties or the agency itself with the 'force of law.'" *Gen. Elec. Corp. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002). As such, EPA's revised interpretation of its Part 70 rules required adequate prior notice and an opportunity to comment. *See Alaska Prof'l Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997).

EPA argues that it met its notice-and-comment obligations because its final interpretation was also mentioned (albeit negatively) in the Agency's proposal. However, this argument proves too much. If the APA's notice requirements mean anything, they require that a reasonable commenter must be able to trust an agency's representations about *which particular* aspects of its proposal are open for consideration. *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991). A contrary rule would allow an agency to reject innumerable alternatives in its Notice of Proposed Rulemaking only to justify *any* final rule it might be able to devise by whimsically picking and choosing within the four corners of a lengthy "notice." Such an exercise in "looking over a crowd and picking out your friends," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2626 (2005), does not advise interested parties how to direct their comments and does not comprise adequate notice under APA § 553(c).

In this case, EPA proposed to codify its interpretation of the Part 70 rules through an amendment of the regulatory text. Whatever a "logical outgrowth" of this proposal may include, it certainly does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse. We therefore hold EPA's final rule violated the APA's notice-and-comment requirements.

### III.  Conclusion

For the reasons set forth above, we grant the petition in No. 04-1083, vacate the final rule, and remand the matter to the Secretary.  *See International Union*, 407 F.3d at 1261; *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  Because we do not reach the issues presented in No. 04-1243, we deconsolidate the cases and call for motions to govern further proceedings in No. 04-1243.

*So ordered.*