III. DISCUSSION
The plaintiffs challenge the 2005 Final Rule on two grounds. First, the plaintiffs argue that the 2005 Final Rule is procedurally deficient under the APA and the Medicare Act because the Rule was not a logical outgrowth of the proposed rules, thereby depriving affected hospitals of fair notice and the ability to submit comments. Pls.' Mem. at 9-19.[6] Second, the plaintiffs *185 contend that the 2005 Final Rule is substantively invalid because it was not the result of reasoned decisionmaking. Id. at 19-25. The defendant responds that the 2005 Final Rule was the logical outgrowth of the 2004 Proposed Rule and that the 2005 Final Rule adequately explains the Secretary's reasoning. Def.'s Mem. at 13-23. These arguments are taken in turn.
A. The 2005 Final Rule Was Promulgated with Adequate Notice and Comment Procedures
The plaintiffs contend that "[t]he rulemaking record leading up to the FY 2005 Final Rule demonstrates interested parties were not provided fair notice of the policy the Secretary ultimately finalized in his FY 2005 Final Rule" because "the Secretary proposed in the FY 2004 Proposed Rule the exact opposite of the policy he summarily 'finalized' in the FY 2005 Final Rule." Pls.' Mem. at 10. The defendant counters that the APA's notice requirement was satisfied because "[t]he final rule was a logical outgrowth of the Secretary's proposal" in the 2004 and 2005 Proposed Rules. Def.'s Mem. at 13. Notwithstanding the sloppy and confusing misstatements in the 2004 and 2005 Proposed Rules, which make this a close case, the defendant has the better argument.
1. The Logical Outgrowth Test
The APA generally requires a federal agency engaged in rulemaking to engage in notice and comment procedures. See 5 U.S.C. § 553(b). Specifically, a "notice of proposed rule making" must be "published in the Federal Register" and notify the public of "the time, place, and nature of public rule making proceedings"; "the legal authority under which the rule is proposed"; and "the terms or substance of the proposed rule or a description of the subjects and issues involved." Id. § 553(b)(1)-(3). Once an agency issues notice of a proposed rule, however, the agency is not required to finalize that proposed rule. Rather, "[a]gencies are free-indeed, they are encouraged-to modify proposed rules as a result of the comments they receive." Ne. Md. Waste Disposal Auth. v. EPA , 358 F.3d 936, 951 (D.C. Cir. 2004).
"Given the strictures of notice-and-comment rulemaking," however, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." Envtl. Integrity Project v. EPA , 425 F.3d 992, 996 (D.C. Cir. 2005) (citing Shell Oil Co. v. EPA , 950 F.2d 741, 750-51 (D.C. Cir. 1991) ); see also Allina Health Servs. v. Sebelius , 746 F.3d 1102, 1107 (D.C. Cir. 2014) ("An agency may promulgate a rule that differs from a proposed rule only if the final rule is a 'logical outgrowth' of the proposed rule." (citing Ass'n of Private Sector Colleges & Univs. v. Duncan , 681 F.3d 427, 442 (D.C. Cir. 2012) ) ); City of Waukesha v. EPA , 320 F.3d 228, 245 (D.C. Cir. 2003) ("The traditional APA 'logical outgrowth' test applies where an agency changes its final regulation in some way from the proposed regulation for which it provided notice and requested comment, as required under the APA."). The "logical outgrowth" doctrine "does not extend to a final rule that finds no roots in the agency's proposal because '[s]omething is not a logical outgrowth of nothing,' " Envtl. Integrity Project , 425 F.3d at 996 (alteration in original) (quoting Kooritzky v. Reich , 17 F.3d 1509, 1513 (D.C. Cir. 1994) ), nor does the doctrine apply "where interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was 'surprisingly distant' from the *186 Agency's proposal," id. (internal citations omitted) (quoting Ariz. Pub. Serv. Co. v. EPA , 211 F.3d 1280, 1299 (D.C. Cir. 2000), and Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin. , 407 F.3d 1250, 1260 (D.C. Cir. 2005) ). That is, courts will "refuse[ ] to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." Id.
A final rule is considered a logical outgrowth of a proposed rule "only if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." Int'l Union , 407 F.3d at 1259 (internal quotation marks omitted) (quoting Ne. Md. Waste Disposal Auth. , 358 F.3d at 952 ); see also Allina , 746 F.3d at 1107 ("A final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible." (quoting CSX Transp., Inc. v. Surface Transp. Bd. , 584 F.3d 1076, 1080 (D.C. Cir. 2009) ) ). "[W]hile the 'logical outgrowth' standard does not require the agency to assiduously lay out every detail of a proposed rule for comment, it does require that the 'agency ... publish notice of either the substance of a proposed rule or a description of the subjects and issues covered by a proposed rule.' " Horsehead Res. Dev. Co. v. Browner , 16 F.3d 1246, 1268 (D.C. Cir. 1994) (internal quotation marks omitted) (quoting Fertilizer Inst. v. EPA , 935 F.2d 1303, 1310-11 (D.C. Cir. 1991) ). As the D.C. Circuit has noted, "[o]ne logical outgrowth of a proposal is surely ... to refrain from taking the proposed step." Am. Iron & Steel Inst. v. EPA , 886 F.2d 390, 400 (D.C. Cir. 1989).
2. Analysis
The 2005 Final Rule is a logical outgrowth of the 2004 Proposed Rule. In the 2004 Proposed Rule, the Secretary explained that the current policy was to include dual-eligible exhausted days "in the Medicare fraction before and after Medicare coverage is exhausted." 2004 Proposed Rule, 68 Fed. Reg. at 27,207. The Secretary then "propos[ed] to change our policy, to begin to count in the Medicaid fraction of the DSH patient percentage the patient days of dual-eligible Medicare beneficiaries whose Medicare coverage has expired." Id. The 2004 Proposed Rule thus put parties on notice that either of these two options might be adopted. Indeed, the Secretary's stated current policy-including dual-eligible exhausted days in the Medicare fraction-is precisely the rule that was ultimately adopted in the 2005 Final Rule. In the Final Rule, the Secretary explained that "we have decided not to finalize our proposal stated in the May 19, 2003 proposed rule" and that, "[i]nstead, we are adopting a policy to include the days associated with dual-eligible beneficiaries in the Medicare fraction, whether or not the beneficiary has exhausted Medicare Part A hospital coverage." 2005 Final Rule, 69 Fed. Reg. at 49,099.
The plaintiffs posit that merely "mention[ing] in a proposed rule [ ] the policy ultimately adopted" does not "put parties on notice that the agency may adopt the mentioned course of action," Pls.' Opp'n Def.'s Cross-Mot. Summ. J. & Reply Supp. Mot. Summ. J. ("Pls.' Reply") at 2, ECF No. 25. Even if that position were correct, the Secretary did more than merely "mention" the final policy here. Rather, the Secretary identified the two options that were available and chose between them. As the plaintiffs recognize, "the unambiguous language of the Medicare Act requires such days be included in one fraction or the other." Pls.' Mot. at 1-2.[7] The 2004 *187 Proposed Rule plainly identified these two possibilities, putting parties on notice that either one was a possible outcome. Moreover, the plain text of the 2004 Proposed Rule put interested parties on notice that the Secretary was considering "chang[ing] our policy" and identified the rule that was ultimately adopted, thus providing the requisite notice.
Nor does the fact that the Secretary misstated the current policy affect this analysis. The 2004 Proposed Rule clearly offered two options that were available to the Secretary: either the misstated "current policy" of including dual-eligible exhausted days in the Medicare fraction, or the proposed policy of including such days in the Medicaid fraction. Even though the stated "current policy" was, in fact, not the Secretary's actual policy, the 2004 Proposed Rule gave interested parties notice that the mistaken current policy might be adopted, because "[o]ne logical outgrowth of a proposal is surely ... to refrain from taking the proposed step." New York v. EPA , 413 F.3d 3, 44 (D.C. Cir. 2005) (quoting Am. Iron & Steel Inst. , 886 F.2d at 400 ).
Furthermore, even though "[t]he Secretary eventually acknowledged his misstatements," Pls.' Mem. at 12, and though "the Secretary's proposal negatively mention[ed] the policy ultimately adopted," Pls.' Reply at 4, these facts also do not invalidate the 2005 Final Rule. While the Secretary did acknowledge, both in a July 7, 2004, website posting and in the 2005 Final Rule, that he had misstated the current policy, the 2004 Proposed Rule still adequately notified interested parties that both the misstated current policy and the proposed new policy were possible outcomes of the rulemaking process. The Secretary's allegedly "negative[ ] mention" of the policy that was ultimately adopted does not preclude the Secretary from changing his outlook after reviewing comments on the virtues of that policy. Rather, the Secretary was free "to modify [the] proposed rule[ ] as a result of the comments [he] receive[d]." Ne. Md. Waste Disposal Auth. , 358 F.3d at 951.
Indeed, the Administrative Record includes many comments opposing the proposed rule, indicating that commenters were on notice that the Secretary was deciding between two options: including dual-eligible exhausted days in either the Medicare fraction or the Medicaid fraction. Numerous commenters during both the initial and the second comment periods wrote in support of the misstated status quo-that is, the policy that was ultimately adopted-to "urge that CMS not change the rules for counting dual-eligible days." AR at 583R (comments of Healthcare Association of New York State); see also id. at 428R (comments of American Hospital Association) ("There are important reasons not to make this change."). Only one commenter wrote in support of the proposed change. See id. at 566R (comments of BlueCross BlueShield Association) ("We *188 agree with the proposed change to include in the Medicaid percentage the patient days of dual-eligible Medicare beneficiaries whose Medicare coverage has expired."). The plethora of comments in support of the rule ultimately adopted by the Secretary indicates that "[c]ommenters clearly understood that [this change] w[as] under consideration," Appalachian Power Co. v. EPA , 135 F.3d 791, 816 (D.C. Cir. 1998), and is "evidence that sufficient notice was given," Abington Mem'l Hosp. v. Burwell , 216 F.Supp.3d 110, 134 (D.D.C. 2016).
The plaintiffs discount "[t]he fact that some commenters actually submitted comments" advocating for the ultimately adopted proposal as "of little significance." Fertilizer Inst. , 935 F.2d at 1312. In Fertilizer Institute , the EPA issued a proposed rule regarding the threshold "reportable quantity" ("RQ") for radionuclides emitted into the environment, id. at 1311, but the final rule instead created several "administrative exemptions" that "excuse parties from notifying the EPA when RQs of radionuclides are released," id. at 1310. The possibility of administrative exemptions was never mentioned in the proposed rule, but the EPA argued that the exemptions were a logical outgrowth in part because "several parties did in fact suggest that administrative exemptions be created." Id. at 1311. The D.C. Circuit concluded that "[t]he fact that some commenters actually submitted comments suggesting the creation of administrative exemptions is of little significance" because the proposed rule "was not sufficient to advise interested parties that comments directed to the creation of administrative exemptions should be made." Id. at 1312. By contrast, in this case the issue of a proposed change and the possible outcomes of that change were directly mentioned in the 2004 Proposed Rule. The 2004 Proposed Rule expressly identified the two options available to the Secretary: either include dual-eligible exhausted days in the Medicare fraction, as the misstated current policy did, or adopt the proposed rule and include dual-eligible exhausted days in the Medicaid fraction. Interested parties were therefore on notice that they should comment either on whether the proposed policy should be adopted or on whether the stated status quo should be maintained.
The plaintiffs primarily rest their argument on three cases, which ultimately offer little support. First, the plaintiffs cite Allina Health Services , which the plaintiffs characterize as "consider[ing] a virtually indistinguishable legal question," resulting in the D.C. Circuit "concluding that a similar policy in the same FY 2005 Final Rule was procedurally invalid." Pls.' Mem. at 14. Allina Health Services addressed a provision of the 2005 Final Rule regarding the fraction in which Medicare Part C enrollees should be included for purposes of the DSH calculation. Allina Health Servs. , 746 F.3d at 1105. In the relevant portion of the 2004 Proposed Rule, the Secretary stated that "we are proposing to clarify that once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction" but should instead be included in the Medicaid fraction. 2004 Proposed Rule, 68 Fed. Reg. at 27,208 (emphasis added). In the 2005 Final Rule, however, the Secretary made no such "clarif[ication]" and instead "adopt[ed] a policy to include the patient days for [Part C] beneficiaries in the Medicare fraction"-the exact opposite of the policy the Secretary had "propos[ed] to clarify." 2005 Final Rule, 69 Fed. Reg. at 49,099. The D.C. Circuit concluded that this result was not a logical outgrowth of the Secretary's "propos[al] to clarify," holding that "[t]he hospitals should not be held to have anticipated that the Secretary's 'proposal to clarify' could have meant that the Secretary was open to reconsidering *189 existing policy. The word 'clarify' does not suggest that a potential major issue is open for discussion." Allina Health Servs. , 746 F.3d at 1108.
In this case, by contrast, the 2004 Proposed Rule clearly indicated that the Secretary was "proposing to change our policy." 2004 Proposed Rule, 68 Fed. Reg. at 27,207. Unlike the proposal at issue in Allina , which merely stated that the Secretary was considering a "clarification," the proposal at issue here put interested parties on notice not only that a change was possible but also that the proffered change might be rejected in favor of the stated current policy. Rather than using the word "clarify" to "unfairly mask[ ] a true policy change (and thereby depriv[e] the public of a meaningful opportunity to comment)," Abington Mem'l Hosp. , 216 F.Supp.3d at 133, the Secretary's 2004 Proposed Rule broadcast that he was considering a change and invited the public to comment on that proposal. By juxtaposing the stated current policy of including dual-eligible exhausted days in the Medicare fraction against the proposed policy of including such days in the Medicaid fraction, the 2004 Proposed Rule "characteriz[ed] [ ] the issue as an open, binary choice between two equally valid interpretations," Allina Health Servs. v. Sebelius , 904 F.Supp.2d 75, 90 (D.D.C. 2012), rev'd in part on other grounds by 746 F.3d 1102 (D.C. Cir. 2014), and gave notice that either of the two interpretations would be adopted. Allina therefore does not control the outcome here, where interested parties properly were notified of a proposed change and given adequate opportunity to comment.
The plaintiffs also contend that this case is similar to International Union , in which the D.C. Circuit struck down a final rule as not being a logical outgrowth of a proposed rule. See Pls.' Mem. at 18-19. In that case, the Mine Safety and Health Administration issued a proposed rule that "[a] minimum air velocity of 300 feet per minute must be maintained" through point-feed regulators in mines. Int'l Union , 407 F.3d at 1259 (internal quotation marks omitted; emphasis and alteration in original). The final rule, however, provided that "[t]he maximum air velocity in the belt entry must be no greater than 500 feet per minute." Id. (internal quotation marks omitted; emphasis and alteration in original). The D.C. Circuit concluded that "the maximum cap provision of the final rule was not a 'logical outgrowth' of the proposed rule," which "did not indicate the possibility of a maximum cap much less one set at 500 [feet per minute]." Id. at 1259-60. Here, by contrast, the 2004 Proposed Rule "indicate[d] the possibility" that dual-eligible exhausted days would be counted in the Medicare fraction, as was ultimately adopted, as well as the possibility that the stated current policy might be changed to count dual-eligible exhausted days in the Medicaid fraction. The notice concerns highlighted in International Union are thus not present in this case.
Finally, the plaintiffs rely on Environmental Integrity Project to argue that "the Agency cannot bootstrap notice from comment" by pointing to comments received as evidence that proper notice was given. Pls.' Reply at 6 (capitalization omitted). In that case, the Environmental Protection Agency ("EPA") had proposed to "clarify" a reporting requirement by "codifying" an interpretation of the Clean Air Act that the EPA had embraced in prior litigation. Envtl. Integrity Project , 425 F.3d at 994. In the final rule, however, the EPA decided not to clarify the relevant provision and instead "switched course and adopted the opposition position." Id. at 995. In concluding that the EPA's final rule was promulgated without proper notice and comment, the D.C. Circuit did not discuss the EPA's *190 argument that the final rule was justified on the basis of public comments. See id. at 995-98. Rather, the D.C. Circuit noted that the EPA's "propos[al] to codify its interpretation" did not provide adequate notice of "the Agency's decision to repudiate its proposed interpretation and adopt its inverse." Id. at 998. Here, by contrast, the Secretary plainly stated in the 2004 Proposed Rule that he was considering "chang[ing] our policy" from the existing policy of including dual-eligible exhausted days in the Medicare formula, thereby giving notice both that he was considering changing the policy and that, if the proposal was rejected, the stated current policy would remain in effect.
Unlike the proposed rules in Allina Health Services , International Union , and Environmental Integrity Project , the 2004 Proposed Rule clearly stated that the Secretary was "proposing to change" a policy and identified the two possible choices: dual-eligible exhausted days would be included in either the Medicare fraction, or the Medicaid fraction. The 2005 Final Rule then adopted one of those two stated options. Accordingly, because the 2005 Final Rule is a logical outgrowth of the 2004 Proposed Rule, the 2005 Final Rule was promulgated with adequate notice and comment procedures and is not procedurally defective.
B. The 2005 Final Rule Was the Product of Reasoned Decisionmaking
The plaintiffs next argue that "the policy finalized in the FY 2005 Final Rule was the product of arbitrary and capricious rulemaking" for three reasons: (1) "[t]he Secretary did not provide much by way of an explanation for his about-face in proposing to count exhausted days," Pls.' Mem. at 19; (2) "the Secretary apparently relied on a flawed understanding regarding the policy's impact on DSH patient percentage calculations," id. at 22; and (3) "the Secretary continued to express confusion about his then-current policy and his new policy,"id. at 24. The defendant counters that "[t]he Secretary adequately explained the choice he made," Def.'s Mem. at 18, that the Secretary understood the impact of his proposal, see id. at 21, and that the Secretary "was certainly aware that he was changing positions" when he revised the regulations, id. at 22. Again, although close, the defendant has the better arguments.
1. Reasoned Decisionmaking
"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." Encino Motorcars, LLC v. Navarro , --- U.S. ----, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016) ; see also Pub. Citizen, Inc. v. FAA , 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). An agency therefore "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Encino Motorcars , 136 S.Ct. at 2125 (quoting State Farm , 463 U.S. at 43, 103 S.Ct. 2856 ). "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." Cty. of L.A. , 192 F.3d at 1021 (internal quotation marks and citation omitted).
Under this framework, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." Encino Motorcars , 136 S.Ct. at 2125 (citing Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs. , 545 U.S. 967, 981-82, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ). To *191 provide a "reasoned explanation" for a change in policy, the agency must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy." FCC v. Fox Television Stations, Inc. , 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) ; see also State Farm , 463 U.S. at 57, 103 S.Ct. 2856 ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis." (quoting Greater Bos. Television Corp. v. FCC , 444 F.2d 841, 852 (D.C. Cir. 1971) ) ). The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one," however. Fox , 556 U.S. at 515, 129 S.Ct. 1800. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." Id.
2. Analysis
The 2005 Final Rule provides adequate explanations for the Secretary's decision to begin counting dual-eligible exhausted days in the Medicare fraction. In the Final Rule, the Secretary detailed several themes of the comments received on the proposed rule, and he explained that the agency "agree[d] with" a comment that "including the days in the Medicare fraction has a greater impact on a hospital's DSH patient percentage than including the days in the Medicaid fraction." 2005 Final Rule, 69 Fed. Reg. at 49,098. The Secretary also acknowledged another commenter's argument that "beneficiaries who have exhausted their Medicare Part A inpatient coverage may still be entitled to other Part A benefits." Id. These two observations help explain the Secretary's decision to count dual-eligible exhausted days in the Medicare fraction: the days would have "a greater impact" when included in the Medicare fraction, and patients who were entitled to other Part A benefits beyond inpatient hospital stays would logically be treated as still being "entitled to benefits under [Medicare] part A," as the statutory definition of the Medicare fraction states. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). Indeed, the DSH adjustment aims to compensate hospitals for treating sick, low-income patients-in other words, individuals who are likely to exhaust their Part A coverage but who remain in the hospital for treatment. Including patient days for these individuals in the Medicare fraction, where the days will often have a greater impact, furthers the purpose of the DSH adjustment. See Def.'s Mem. at 21.
Notably, the Sixth Circuit has examined this same rule and concluded that the 2005 Final Rule "appears to be the result of a reasoned deliberative process, reflecting HHS's experience in case-by-case administrative adjudications and in federal-court litigation, and its benefitting from stakeholder input through notice-and-comment rulemaking." Metro. Hosp. v. U.S. Dep't of Health & Human Servs. , 712 F.3d 248, 268 (6th Cir. 2013). In Metropolitan Hospital , the Sixth Circuit addressed whether the interpretation set forth in the 2005 Final Rule was entitled to Chevron deference, concluding that "the rulemaking process was not arbitrary and that the resulting regulation is a permissible construction of the DPP provision that warrants judicial deference under Chevron ." Id. at 270. The Sixth Circuit noted that the Secretary had "appropriately considered the[ ] comments" without "blindly accept[ing] them as true," id. at 270, had "recognized th[e] inconsistency" in his prior interpretations of the phrase "entitled to benefits under [Medicare] part A," id. at 269, and had *192 adopted the interpretation that would "facilitate consistent handling of these days across all hospitals," 2005 Final Rule, 69 Fed. Reg.at 49,098. The court thus concluded that the 2005 Final Rule was "the product of a reasoned analysis" rather than "an ad hoc determination meant to unduly restrict DSH adjustments." Metro. Hosp. , 712 F.3d at 269. Although not binding on this Court, the Sixth Circuit's reasoning is persuasive, lending strength to the defendant's argument that the 2005 Final Rule was the product of reasoned decisionmaking.
The plaintiffs nevertheless argue that " 'acknowledging a point' and 'agree[ing] with a commenter' about the 'impact' of a policy do not provide the explanation demanded by the APA" because "the Secretary did not explain whether he agreed with the commenter point [sic] that the Secretary 'acknowledged.' " Pls.' Mem. at 20. The plaintiffs' own brief belies that argument, as the plaintiffs recognize that the Secretary "agree[d] with [the] commenter." Id. After agreeing with this commenter, the Secretary went on to state that, "[f]or these reasons," he had "decided not to finalize our proposal stated in the May 19, 2003 proposed rule." 2005 Final Rule, 69 Fed. Reg. at 49,099. The text of the 2005 Final Rule indicates that the Secretary carefully considered the comments and used those comments in reaching a well-reasoned decision.
The plaintiffs also argue that the Secretary's decision is arbitrary and capricious because the Secretary "apparently relied on a flawed understanding regarding the policy's impact on DSH patient percentage calculations." Pls.' Mem. at 22. Specifically, the plaintiffs contend that the Secretary was "simply wrong" in his statement that "including the days in the Medicare Fraction has a greater impact on a hospital's DSH patient percentage than including the days in the Medicaid Fraction," 2005 Final Rule, 69 Fed. Reg. at 49,098, and in his statement that "[t]his is necessarily so because the denominator of the Medicare fraction (total Medicare inpatient days) is smaller than the denominator of the Medicaid fraction (total inpatient days)," id.[8]
*193 The Secretary understood, however, that "including days in the Medicaid fraction instead of the Medicare fraction" would not always "result[ ] in a reduction in DSH payments." Id. Rather, the Secretary noted that "if a dual-eligible beneficiary has not exhausted Medicare Part A inpatient benefits, and is not entitled to SSI benefits, the patient days for that beneficiary are included in the Medicare fraction, but only in the denominator of the Medicare fraction (because the patient is not entitled to SSI benefits)." Id. The Secretary further stated that "[t]he inclusion of such patient days in the Medicare fraction has the result of decreasing the Medicare fraction in the DSH patient percentage," id. , a recognition in line with the hypothetical presented in the plaintiffs' brief. See note 8, supra . As the defendant argues, "Plaintiffs are simply wrong to suggest that the Secretary was unaware of this possible effect." Def.'s Mem. at 21.
The plaintiffs also argue that the final rule was arbitrary and capricious because "the Secretary failed to acknowledge the policy he was changing." Pls.' Mem. at 24. The 2005 Final Rule expressly states, however, that "[o]ur policy has been that only covered [that is, unexhausted] patient days are included in the Medicare fraction." 2005 Final Rule, 69 Fed. Reg. at 49,098. The Secretary also noted that he had "inadvertently misstated" the current policy in the 2004 Proposed Rule and included a link to the July 7, 2004, website posting notifying the public of that misstatement. Id. While the Secretary could have been clearer throughout the rulemaking process regarding the current policy and the proposed changes to current policy, the Secretary did acknowledge the policy that he was changing, as required by the APA. See Fox , 556 U.S. at 515, 129 S.Ct. 1800.
The plaintiffs also allege that the Secretary "utterly failed to acknowledge that removing the reference to 'covered' days from 42 C.F.R. § 412.106(b)(2)... would have an effect on other non-covered days such as MSP days"-that is, days for which a patient does not receive Medicare Part A benefits because another entity paid for the inpatient hospital stay. Pls.' Mem. at 25. Notably, the plaintiffs raised this claim as part of their argument that the 2005 Final Rule was arbitrary and capricious, not that the 2005 Final Rule was procedurally deficient, thereby waiving the latter argument. See Pl.'s Mem. at 25 (arguing that "[t]he Secretary's policy of counting non-covered days such as exhausted days and MSP days in the Medicare Fraction is substantively invalid, as the Secretary did not provide a reasoned explanation for the change and did not even demonstrate a basic understanding of his prior policy, the change he promulgated, and the effects of the change"). Nevertheless, even assuming both arguments were properly raised, the Secretary's failure to specifically discuss the 2005 Final Rule's impact on MSP days does not invalidate the rule on either score. The Secretary stated in the 2005 Final Rule that "[o]ur policy has been that only covered patient days are included in the Medicare fraction," 2005 Final Rule, 69 Fed. Reg. 49,098, meaning that only days for which Medicare Part A benefits were actually received were included in the Medicare fraction. That statement would also exclude from the Medicare fraction MSP days, or days when a patient is entitled to Medicare Part A benefits but does not actually receive those benefits because a secondary payer covered the costs.
Moreover, as the defendant points out, the 2005 Final Rule concerned whether a patient could be "entitled to benefits under [Medicare] Part A" when the patient did not actually receive any Part A benefits. Def.'s Reply Supp. Cross-Mot. Summ. J. ("Def.'s Reply") at 8 n.3, ECF No. 29. "If *194 the Secretary answered in the affirmative (as he ultimately did) then patient days for Medicare beneficiaries would be included in the Medicare fraction, regardless of whether the program paid for their care on that day." Id. That policy logically would also apply to a patient who was entitled to benefits under Part A, but who did not actually receive any Part A benefits because payment had already been made by another source. Indeed, the D.C. Circuit has accorded deference to the Secretary's position that "entitlement to Medicare benefits is simply a matter of meeting the statutory criteria, not a matter of receiving payment." Catholic Health Initiatives , 718 F.3d at 919-20 (citing 42 C.F.R. § 400.202 ("Entitled means that an individual meets all the requirements for Medicare benefits.") ). Four appellate courts also have concluded that "the Medicaid proxy includes all patient days for which a person was eligible for Medicaid benefits, whether or not Medicaid actually paid for those days of service," Cabell Huntington Hosp. v. Shalala , 101 F.3d 984, 991 (4th Cir. 1996), indicating that the same conclusion about the Medicare proxy reasonably could have been expected and strengthening the defendant's argument that "there is no reason to think that the Secretary failed to realize" that his interpretation "would have consequences beyond the dual-eligible patient days that were the explicit subject of this rulemaking." Def.'s Mem. at 22; see also id. at 5 n.1; Legacy Emanuel Hosp. v. Shalala , 97 F.3d 1261, 1265 (9th Cir. 1996) ; Deaconess Health Servs. Corp. v. Shalala , 83 F.3d 1041 (8th Cir. 1996) (per curiam); Jewish Hosp. v. Sec'y of Health & Human Servs. , 19 F.3d 270, 276 (6th Cir. 1994). As the defendant argues, "[t]hat the Secretary did not provide an elaborate typology of all such days" that might possibly have been affected by the rule "does not undermine the rationality of his decision to adopt this interpretation." Def.'s Reply at 10 n.4. The failure to specifically mention MSP days thus does not render the 2005 Final Rule procedurally deficient or arbitrary and capricious.
Finally, the plaintiffs repeatedly contend that the Secretary's "actual practice prior to the rulemaking challenged in this case" was "nonsensical" and must be corrected. Pls.' Mem. at 7 ("[T]he actual practice prior to the rulemaking challenged in this case was that, at least for some years, such days were nonsensically excluded from both fractions."); id. at 26 ("Any pre-FY 2005 practice of excluding such days from both fractions is nonsensical."). As already discussed, it is not clear that the Secretary had such a practice of excluding dual-eligible exhausted days from both fractions. See supra note 7. Nevertheless, to the extent that the plaintiffs suggest the Secretary's practice prior to the 2005 Final Rule was "nonsensical," the 2005 Final Rule is an improvement as it sets forth a clear policy of including dual-eligible exhausted days in the Medicare fraction.
Given that the FY 2005 Final Rule is procedurally sound and the product of reasoned decisionmaking, it is unnecessary to address the plaintiffs' argument that "CMS Ruling 1498R must also be vacated to the extent based on the deficient and invalid policy in the FY 2005 Final Rule," Pls.' Mem. at 26, and the plaintiffs' argument that vacatur with an injunction, rather than a remand, is the appropriate remedy, id. at 25-28.
IV. CONCLUSION
For the foregoing reasons, the plaintiffs' motions for summary judgment are denied and the defendant's cross-motions for summary judgment are granted. An appropriate *195 Order accompanies this Memorandum Opinion.

Although the plaintiffs argue that the "2005 Final Rule is procedurally deficient under both the APA and the Medicare Act," Pls.' Mem. at 9 (capitalization omitted), the parties' arguments are based only on the APA. See Pls.' Mem. at 9-19; Def.'s Mem. at 13-18. As relevant to this dispute, the requirements of the APA and the Medicare Act are substantially similar: the Medicare Act provides that if a final regulation "is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation." 42 U.S.C. § 1395hh(a)(4). Thus, the conclusions reached on the APA claim are equally applicable to the Medicare Act claim.

The plaintiffs at times seem to dispute that dual-eligible exhausted days must be included in either the Medicare or the Medicaid fraction, arguing that, "complicating the matter, the actual practice prior to the rulemaking challenged in this case was that, at least for some years, such days were nonsensically excluded from both fractions." Pls.' Mem. at 12 (quoting Catholic Health Initiatives , 718 F.3d at 921 ). This dispute rests on a misreading of Catholic Health , which noted only that "the policy of excluding dual-eligible exhausted days from the Medicaid fraction was announced [in 2000], and the [2004] rulemaking was simply a reiteration of this position." Catholic Health Initiatives , 718 F.3d at 921. Catholic Health Initiatives does not indicate that the prior practice was to exclude dual-eligible exhausted days from both fractions. In addition, the plaintiffs have acknowledged that "the unambiguous language of the Medicare Act requires such days be included in one fraction or the other." Pls.' Mot. at 1-2.

In support of this argument, the plaintiffs offer a hypothetical situation: Suppose that, ignoring dual-eligible exhausted days, a hospital's Medicare fraction is 7 percent (that is, 70 out of 1000 Medicare covered days are attributable to patients with unexhausted Part A benefits and also entitled to SSI benefits). Suppose also that, again ignoring dual-eligible exhausted days, the same hospital's Medicaid fraction is also 7 percent (that is, 140 out of 2000 total covered days were attributable to patients eligible for Medicaid but not entitled to Medicare Part A benefits). If this hospital also had 50 dual-eligible exhausted days for patients not entitled to SSI benefits, then including the exhausted days in the Medicare fraction would have the impact of reducing the Medicare fraction to 6.67 percent (or 70 out of 1050 Medicare covered days), because the 50 exhausted days would be added only to the denominator. By contrast, including the exhausted days in the Medicaid fraction would increase the Medicaid fraction to 9.5 percent (or 190 out of 2000 days), because the days would be included in only the numerator. See Pls.' Mem. at 22-23. The plaintiffs' example does not acknowledge, however, that if the hospital instead had 50 dual-eligible exhausted days for patients who were entitled to SSI benefits, then including the exhausted days in the Medicare fraction would increase the Medicare fraction from 7 percent to 11.4 percent (or 120 days out of 1050 Medicare covered days), while including those days in the Medicaid fraction would increase the Medicaid fraction from 7 percent to only 9.5 percent, as shown above. Indeed, the poorest patients are those that are most likely to be entitled to SSI benefits, see Catholic Health , 718 F.3d at 916 (characterizing SSI as "welfare"), and the inclusion of their exhausted days in both the numerator and the denominator of the Medicare fraction will therefore have the effect, generally, of increasing the DPP more than including those days in the Medicaid fraction would increase the DPP.